AO 91 (Rev. 11/11)  Criminal Complaint

FILED

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

SEP 03 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America <br> v. <br> Brenda Addison, | ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No.      3  19  71431

UNDER SEAL

JCS

_____
Defendant(s)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____November 23, 2015_____ in the county of _____San Francisco_____ in the

____Northern____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

=1

WSN

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_____
WILLIAM FRENTZEN
Assistant United States Attorney

Sworn to before me and signed in my presence.

Date:  9/3/19

City and state:      San Francisco, California

_____
Complainant's signature

Katelyn McKendrick, Special Agent - FBI
Printed name and title

_____
Judge's signature

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
Printed name and title

<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**</u>

I, Katelyn McKendrick, Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, hereby depose and state as follows:

I.   INTRODUCTION

    **A.   SYNOPSIS**

    1.   I submit this affidavit in support of a criminal Complaint for BRENDA ADDISON (hereafter "ADDISON").

    2.   There is probable cause to believe ADDISON has engaged in paying kickbacks to doctors and other medical professionals in exchange for the referral of Medicare patients to AMITY for home health services in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

    3.   As part of this investigation, agents have obtained information and evidence from FBI cooperating witnesses "CW-1"[1] and

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services.  However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation.  As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased.  These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA.  A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship.  CW-1 is a removable alien, removal has been deferred under the Convention Against Torture.  The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status.  After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual.  To my knowledge, those threats were never carried out.  CW-1 is not currently the subject of any pending criminal charges.

"CW-2"[2], as well as evidence obtained through the execution of search warrants and corroborating documentary evidence.

**B.    BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION**

4.    Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b).  The relevant language of the statute is listed below.  In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care."  FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice.  Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services.  The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring.  Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a

---

[2] CW-2 has provided information and services to the FBI and has received no monetary compensation from the FBI in exchange for the information and services. CW-2 has cooperated pursuant to an agreement with the United States Attorney's Office for the Northern District of California to provide information to law enforcement and is seeking leniency from the government with respect to his/her own role related to paying kickbacks in the Northern District of California.

"longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.

5.    An undercover operation was selected as the means of investigating kickbacks.  From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy.  Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives.  Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services.  Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective.  An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments.

6.    Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area.  One of the two agreed to serve as a cooperating witness ("CW-1").  CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's

patient population through illegal kickbacks.  UCE often communicated with targets in furtherance of the UCO while in San Francisco.  The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

7.    In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required.  For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks.  Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand.  The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies.  Further, the care provided by the vetted HHA could be monitored and reviewed.

8.    In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO.  The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA

Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints, which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care. During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA

Alpha.  At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received.  Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C.    AGENT QUALIFICATIONS

9.    I am a Special Agent of the FBI and have been so employed since 2015.  I am currently assigned to the Complex Financial Crime Squad of the FBI's San Francisco Field Division.  As part of my assigned duties, I investigate possible violations of federal criminal law.  I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims.  I have participated in the execution of various arrest and search warrants in which business and personal documents, bank records, computers, and other evidence of health care fraud and other crimes have been seized.

10.    The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and the circumstances described herein, and information gained through my training and experience. This affidavit is intended to show that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  Where

excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D.   COMPLAINANT

11.   **BRENDA ADDISON**, is a 49-year-old U.S. citizen who is believed to reside in Oakland, California.

### E.   STATUTES VIOLATED

12.   **Title 42, United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II.   PROBABLE CAUSE

### A.   CASE SUMMARY

13.   During the course of the investigation, the FBI identified AMITY as being involved in a conspiracy to pay kickbacks to doctors and other medical professionals for the certification or referral of patients for home health or hospice services.  In effect, the FBI believed that employees and/or affiliates of AMITY were bribing individuals associated with hospitals, skilled nursing facilities, and doctors' offices in order to induce those individuals to send patients to AMITY.

14.   Information provided by CW-1, physicians, and other health care professionals (including, but not limited to, hospital case managers, social workers, and home health marketers) indicated AMITY

controlled the majority of patient referrals coming to area HHAs from surrounding hospitals and medical offices.  Per a number of individuals identified during the investigation, AMITY's control over the patient referral market was reportedly the result of the agency's willingness to pay kickbacks for patient referrals and outbid other HHAs engaged in similar kickback schemes.  Based on a review of Medicare claims data of multiple HHAs within the San Francisco Bay Area, AMITY appeared to have significant control of the patient population compared to other HHAs in the surrounding area.  Since January 1, 2013, AMITY has received approximately $105,000,000 in payments from Medicare for home health services purportedly rendered.

15.   In January 2017, CW-1 identified Glennda Santos ("SANTOS") as a prominent marketer employed by several HHAs in the area, including AMITY.  SANTOS was employed by AMITY as a marketing consultant from approximately August 2015 through the first quarter of 2019.

16.   CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area.  In so doing, according to CW-1, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs, including AMITY.

17.   In March 2017, the FBI began the UCO and introduced the UCE as CW-1's business partner.  The UCO initially focused on SANTOS and individuals believed to be accepting kickbacks from her.

18.   As part of the UCO, CW-1 and the UCE told SANTOS that they were partnering to increase the patient population at HHA Alpha.  CW-1 and the UCE told SANTOS that CW-1 and several investors,

represented by the UCE, would eventually buy HHA Alpha at a later date. As part of their agreement, SANTOS would introduce CW-1 and the UCE to individuals willing to accept kickbacks for patient referrals. The UCE further told SANTOS she would receive an interest in HHA Alpha as compensation for the introductions. Later, the UCE, CW-1, and SANTOS agreed that SANTOS would be compensated in cash for each patient referral or introduction to physicians, case managers, or other health care professionals who could refer patients to HHA Alpha.

19. The UCO was based on a referral system; identified co-conspirators would introduce medical professionals to CW-1 and the UCE who were willing to participate in a similar patient referral kickback scheme.

20. During the course of the UCO, SANTOS introduced individuals she knew to already be engaged in kickback schemes, to include, physicians, case managers, and social workers willing to accept kickback payments in exchange for home health or hospice patients.

21. On or about August 30, 2017, SANTOS introduced CW-2 to CW-1 and the UCE; CW-2 at the time of the introduction, was employed by AMITY. During the course of the UCO, the UCE paid CW-2 cash in exchange for patient referrals and the introduction to a medical professional who accepted kickback payments in exchange for the referral of patients. At this point in the investigation, CW-2 was not a cooperating witness but rather a subject of the investigation.

B.   **ADDISON'S ROLE AT AMITY AND KNOWLEDGE THAT KICKBACK PAYMENTS FOR THE REFERRAL OF PATIENTS IS ILLEGAL**

22. SINGH has employed multiple marketers at AMITY, to include ADDISON, SANTOS, and CW-2. Typically, a legitimate home health

marketer would meet with doctors, hospital case managers, and other health care professionals to provide promotional information about the agency in an effort to obtain patient referrals. Based on my training and experience, however, the term "marketer" is also known to refer to individuals willing to pay kickbacks for the referral of patients.

23. CW-2 described the legitimate role of a marketer in the home health care industry as someone who sells the HHA's services, i.e. nursing, physical therapy, occupational therapy, and social work services. The marketer would attempt to procure new business/clients by handing out pamphlets and spreading the word about the HHA. CW-2 stated, when he/she first became a marketer in the home health care industry, CW-2 did indeed market as outlined above. While marketing for AMITY, SINGH began to trust CW-2 and instructed CW-2 to take clients out to elaborate meals, sporting events, and purchase gifts for individuals willing to provide AMITY with patients, mainly Medicare patients. When patient referrals were slow, SINGH directed CW-2 to incentivize clients with gifts in effort to induce them to refer more patients to AMITY. CW-2's clients mainly consisted of case managers at hospitals, social workers at skilled nursing facilities, doctors, and office staff at doctors' offices.

24. CW-2 stated that ADDISON was an AMITY marketer and considered to be SINGH's "right hand". CW-2 believed that ADDISON was aware of all the kickback payments made by AMITY employees to individuals, to include doctors, for the referral of patients to AMITY.

25. According to AMITY's filings with the California Employment Development Department ("EDD"), ADDISON has been employed with AMITY

starting in the second quarter of 2015.  According to EDD records, ADDISON is also employed with Advent Care, Inc. ("ADVENT"), SINGH's hospice company located in Hayward, CA.

26.  On or about January 17, 2018, CW-2 and ADDISON were part of a WhatsApp text string.  In the WhatsApp conversation, CW-2 and ADDISON discussed their concerns regarding AMITY Marketer 1 ("AM-1"[3]). CW-2 informed ADDISON that AM-1 no longer wanted to pay kickbacks to individuals for the referral of patients to AMITY.  ADDISON and CW-2 expressed their concerns regarding AM-1 and that they had no intention of going to prison because of AM-1.  I believe the conversation between CW-2 and ADDISON conveys their understanding that paying kickbacks for the referral of patients is illegal.  This text conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

---

[3] Throughout this affidavit the names of physicians, individuals, and entities not charged during this investigation have been redacted.

| Speaker | Text Statement | Additional Explanation |
|---------|----------------|------------------------|
| CW-2: | [CW-2 sent ADDISON screenshots of a text string between CW-2 and AM-1. The screenshots contained the following text communication]<br><br>AM-1: Ate can I give the gc to you tomorrow?<br><br>CW-2: What gc?<br><br>AM-1: The ones I got before coming back. I haven't given out<br><br>CW-2: U don't wanna do it anymore?<br><br>AM-1: And no ate, I don't wanna do that anymore. I've been doing good marketing without (: | CW-2 shared the text conversation between CW-2 and AM-1 with ADDISON.<br><br>I believe AM-1 wants to return the "gc", i.e. gift cards, to CW-2. AM-1 states that he/she was not incentivizing individuals with the gift cards and no longer wants to pay kickbacks. I believe that AM-1 states to CW-2 that he/she is doing "good marketing without" meaning that AM-1 was getting patient referrals without incentivizing individuals with kickback payments.<br><br>"Ate" is a Filipino term defined as a reference to an older female relative or respected friend in Tagalog. |
| CW-2: | Feels to me like she's washing her hands clean.... then later on turn us all in?? That's what I meant by early retirement? [emoji] doesn't make sense | CW-2 explains to ADDISON her thoughts regarding AM-text messages. CW-2 expresses concern that AM-1 is "washing her hands clean" or coming clean by not wanting to pay kickbacks and AM-1 would then "turn us all in," meaning informing authorities of AMITY's kickback activities. |
| ADDISON: | I know right she must know something we don't. We can't be left out to be hanged. She needs to tell us what she has did and what she knows. It was food a month ago and now this sh. | |
| CW-2: | Yes totally don't trust her with this whole issue | |
| ADDISON: | Ikr I'm getting a lil scared. | "Ikr" is an abbreviation for the phrase "I know, right." |

12

| Speaker | Text Statement | Additional Explanation |
|---------|----------------|------------------------|
| CW-2: | She's definitely up to something.... I can soooo feel it | |
| ADDISON: | I'm telling I don't look good in orange and not for the cause of her<br><br>Lol | I believe ADDISON is stating that she does not want to go to prison because of AM-1 and "I don't look good in orange" refers to wearing an orange jumpsuit in prison. |
| CW-2: | Fuck that! I ain't wearing that color for her either [emoji] | |

**C.   ADDISON PARTICIPATES IN AMITY CHECK CASHING SCHEME FOR CASH KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS**

27.   On or about February 22, 2018 through March 2, 2018, CW-2 and ADDISON were part of a WhatsApp text string.   In the WhatsApp conversation, CW-2 and ADDISON discussed (1) paying Individual 1 a kickback payment in the form of $2,000 in cash for the referral of patients; (2) ADDISON's concern with CW-2 receiving too many AMITY checks in his/her name; and (3) CW-2 informing ADDISON that Individual 1 agreed to the arrangement of $500 dollars per patient referral.   This text conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---------|----------------|------------------------|
| CW-2: | Sis, also talked to [Individual 1], if u can give me funds for what we owe him? He has pts but won't give until we pay him for previous ones | CW-2 is requesting funds from ADDISON to pay Individual 1 for the patients he referred to AMITY. Individual 1 will not continue to refer patients until he is paid for his previous referrals. |

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| ADDISON: | Ok I will work to get it and will tell boss you need to | ADDISON will work on getting CW-2 the funds and will inform the "boss", i.e. SINGH. |
| CW-2: | 2k for him | I believe "2k" refers to $2,000. |
| ADDISON: | Ty | "Ty" is an abbreviation for "thank you." |
| CW-2: | My plan is for him to introduce me to his contacts for hospice source then buh bye! [emoji 👋] lol | I believe CW-2 planned to use Individual 1 for an introduction to his source of hospice patients and would cut him out of the scheme once CW-2 was introduced.

"Lol" is an abbreviation for the phrase "laughing out loud." |
| ADDISON: | Ok Lol | |
| CW-2: | [CW-2 sent ADDISON a picture of a handwritten notebook page titled "FEB. LOVE"]

Ones without dates I haven't given | The "FEB. LOVE" picture can be found following the text string.

The picture includes seven rows of numbers totaling $37,940, which appear to match the check numbers and the check totals that were made out to "CW-2" in February 2018.  The picture also includes a list of names, including names of doctors.  CW-2 recognized this paper as his/her own handwriting and described that it was from his/her notebook where CW-2 kept track of kickback payments and patient referrals.  Each name has a number next to it which CW-2 told investigators was the amount of money, in thousands, that each individual was paid for the referral of patients to AMITY.

CW-2 described "love" as an incentive in the form of cash and/or gift cards given in exchange for patient referrals. |
| CW-2: | Now plus [Individual 1] | The picture of "FEB. LOVE" did not include Individual 1's name. |

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| ADDISON: | To many checks foe you | ADDISON responds that CW-2 has received too many checks written in his/her name for the month of February 2018.<br><br>I believe ADDISON viewed the "FEB. Love" picture and was concerned that CW-2 cashed over $37,000 in one month and didn't want to issue CW-2 any more checks. |
|  | ... |  |
| CW-2: | For [Individual 1] meeting him at noon will use my own for now<br><br>He agreed 500 per pt, so I'll pay him for those two pts | CW-2 scheduled a meeting with Individual 1.  Individual 1 agreed to be paid $500 per "pt", i.e. patient referral.  CW-2 stated that he/she would use his/her own money to pay Individual 1 since he/she has received too many checks from AMITY for that month. |
| ADDISON: | Ok good |  |

15



28.   CW-2 confirmed the receipt of eight checks from AMITY written in his/her name for the month of February 2018.   CW-2 cashed the February 2018 checks which were specifically used for cash kickback payments to individuals, including doctors, for the referral of patients to AMITY.

29.   CW-2 explained that AMITY took all patient referrals from various insurances, to include, Medicare, Medi-Cal, and private insurance; however, the marketers only counted the Medicare patient

referrals.  CW-2 stated Medicare patients were highly desired due to the high reimbursement rates from Medicare and AMITY made its money off the Medicare patients.

30.  In the course of this investigation, the FBI has obtained records from Fremont Bank of Business Regular Checking account ending in 1173 (the "1173 Fremont Account") belonging to AMITY.  SINGH was one of three individuals listed on the 1173 Fremont Account Signature Care Agreement.  The records obtained span the dates of November 16, 2017 through and including March 29, 2019.  Through a review of these records, I have learned that in February 2018, during the same time period as the above mentioned WhatsApp messages, CW-2 received eight checks, paid to the order of "CW-2" totaling $44,040, ranging in amounts from $4,400 to $6,300.  CW-2 reviewed the eight checks and confirmed that they were signed by SINGH.  The signature on the checks reviewed by CW-2 appeared to match SINGH's signature on the 1173 Fremont Account Signature Card Agreement.  CW-2 stated the purpose of the eight checks was to cash them and use the cash to pay kickbacks to individuals, including doctors, for the referral of patients to AMITY.

31.  CW-2 would cash the checks from AMITY at CW-2's personal bank, as well as, a check cashing company located on Castro Valley Boulevard that was utilized to cash checks by multiple AMITY employees.

32.  In the course of this investigation, the FBI has obtained records from Community Choice Financial, California Check Cashing ("CA Check Cashing") located in Castro Valley, California.  The records obtained span the dates of January 2012 through and including February 2019.  ADDISON, CW-2, and SANTOS, among other AMITY

17

employees, have utilized the CA Check Cashing company to cash checks from AMITY.

33.   Through a review of the CA Check Cashing records, ADDISON cashed approximately 18 checks for a total of at least $104,300 from March 2018 to January 2019.

34.   In the course of this investigation, the FBI has obtained records from Wells Fargo Bank, N.A. of an Expanded Business Checking account ending in 3890 (the "3890 WF Account") belonging to AMITY. The records obtained span the dates of January 1, 2013 through and including December 31, 2017.

35.   Through my review of the financial records of both the 1173 Fremont Account and the 3890 WF Account from November 2015 through and including March 2019, I have learned, among other things, the following:

a. CW-2 has received approximately 200 checks paid to the order of CW-2 from AMITY for at least $1,077,000.

b. ADDISON has received approximately 118 checks paid to the order of ADDISON from AMITY for at least $853,600.

c. SANTOS has received approximately 166 checks paid to the order of SANTOS from AMITY for at least $786,300.

d. CW-2 stated that SINGH employed multiple marketers. CW-2 knew of at least twelve AMITY employees, including ADDISON and SANTOS, who were instructed to participate in the check cashing scheme to get cash for kickback payments to pay individuals, to include doctors, for the referral of patients to AMITY.

e. Based on a review of the 1173 Fremont Account and the 3890 WF Account, the twelve AMITY employees reported by CW-2, have received over $5.5 million dollars in checks paid out in their names.

f. The checks paid to the twelve AMITY employees, to
include ADDISON and SANTOS, were similar in nature to CW-2's checks
based on the dollar amount and the number of checks written per
month.  For example, in February 2018, ADDISON received approximately
six checks totaling $36,090 and ranging in amounts from $5,210 to
$6,300 which were similar to CW-2's eight checks that were cashed in
February 2018.  Additionally, in February 2018, SANTOS received five
checks from AMITY in SANTOS' name totaling $28,360 ranging in amounts
from $5,210 to $6,480.  Therefore, based on CW-2's statements and the
similar nature of the checks, I believe these checks were used for
the purpose of paying kickbacks to individuals, to include doctors,
for the referral of Medicare patients to AMITY.

**D.   ADDISON AND SINGH PAY KICKBACKS IN THE FORM OF CHECK AND
CASH TO DR. GERALD MYINT FOR THE REFERRAL OF MEDICARE
PATIENTS TO AMITY**

36.   On January 15, 2019, the Honorable United States Magistrate
Judge Kandis A. Westmore approved applications by the FBI for a
warrant to search the business office and cell phone associated with
Dr. Gerald Myint ("MYINT"), an internal medicine physician located in
Hayward, California.  On January 16, 2019, FBI Agents executed the
search warrants on MYINT's office and cell phone.  During the
execution of the search warrants, MYINT was interviewed in person by
FBI Agents at MYINT's office located in Hayward, California.  MYINT
was aware of the Agents' affiliation with the FBI and was advised
that it was a crime to lie to a federal law enforcement officer.  The
interview between Agents and MYINT was surreptitiously recorded via
audio recording device in its entirety.  During the interview, MYINT
identified SINGH from a current DMV photograph.  MYINT described

19

SINGH as an owner or a boss at AMITY.  Approximately four years ago,
MYINT and SINGH negotiated a deal for MYINT to obtain a payment of
$2,500 per month for referring his patients to AMITY.  MYINT
estimated he referred two to three, and sometimes seven to eight
patients to AMITY per month during this time.  MYINT referred to the
payments he received as "gifts."  During the negotiation, SINGH
wanted MYINT to be the medical director for AMITY.  When Agents asked
if MYINT was truly a medical director for AMITY or if the position
was just on paper, he said that he signed a contract with AMITY.
However, MYINT stated that he honestly did not physically go to AMITY
very often and handled matters by phone.  MYINT estimated he worked
less than ten hours per month as the medical director at AMITY and
the job only lasted for the first year when he was being paid by
check.  MYINT was not working as the medical director for AMITY when
he was receiving cash payments.

     37.  After receiving monthly checks from AMITY for approximately
one year, MYINT felt he may be doing something wrong or perhaps
illegal.  Therefore, he stopped his relationship with AMITY and
stopped receiving checks.  Then, MYINT heard of other doctors
receiving kickback payments and decided to continue receiving
kickback payments from AMITY.  Approximately one year after he
stopped receiving checks from AMITY, MYINT and SINGH renegotiated the
terms of kickback payments.  SINGH agreed to pay MYINT $3,000 in cash
per month for referring his patients to AMITY.  Since this new
agreement was made approximately two years ago from the date of the
interview, MYINT had been receiving an envelope filled with $3,000 in
cash every month from AMITY.  According to MYINT, SINGH initially
delivered checks to him directly, and she was the person who

negotiated the terms of the payment with him.  SINGH's assistant, whom MYINT only knew as "Brenda", i.e. ADDISON, later delivered the money to him every month.  ADDISON would normally contact MYINT on his cellular telephone to ensure he was in the office, then deliver the cash, consisting of $100 bills, in an envelope to his office. MYINT told the FBI that the most recent cash delivery he received from ADDISON was an envelope filled with $3,000 in cash earlier in the same month as the interview, January 2019.

38.  Based on a review of the 1173 Fremont Account and the 3890 WF Account, MYINT received two checks in 2013 for $2,500 for purported consulting services.  In October 2016 though and including July 2017, MYINT received approximately five checks ranging between $4,975 and $6,250.  The total amount received via check was approximately $31,200.  According to AMITY's Medicare billing data from January 2013 to January 2, 2019, MYINT was listed as the attending physician for approximately 242 beneficiaries for whom AMITY submitted claims to Medicare.  In turn, Medicare reimbursed AMITY approximately $1,319,100 for those patients.

39.  Based on my training and experience, I am familiar with the Stark Law (42 U.S.C. § 1395nn), a law generally making it illegal, punishable by civil penalties and exclusion from participation in Federal health care programs, for a physician to refer patients for home health care services to an HHA with which the physician has a compensation arrangement, absent the application of a safe harbor provision.  Because of this law, in my training and experience, physicians who legitimately enter into agreements to act as medical directors or consultants for home health care agencies endeavor to avoid also making referrals to those agencies.  The extensive

practice of physicians receiving director or consulting payments from AMITY while contemporaneously referring patients to AMITY further demonstrates that probable cause exists to believe that such payments were made illegally in exchange for the patient referrals.

**E.   ADDISON UTILIZED AMITY AMERICAN EXPRESS CREDIT CARD ACCOUNT TO FACILITATE KICKBACK PAYMENTS FOR THE REFERRAL OF PATIENTS**

40.   CW-2 was given an AMITY American Express credit card to purchase various items including gift cards, gifts, and tickets for sporting events, concerts, and trips to Las Vegas.  Those gifts were specifically for the purpose of influencing individuals to refer patients to AMITY.  CW-2 had to ask SINGH for permission prior to using the credit card for expenditures.  SINGH set the credit card limit to $1,000 at the beginning of each month and would authorize increases as she allowed CW-2 to make purchases.  CW-2 stated that ADDISON had an AMITY AMEX credit card and was one of the only marketers without a monthly limit.

41.   In the course of this investigation, the FBI has obtained and reviewed records from American Express for credit cards statements related to AMITY.  SINGH was the main account holder for the AMITY Business Gold Rewards credit card (the "AMEX Account"). The records obtained span the dates of December 28, 2012, through May 29, 2018 and include a multitude of credit card holders and credit card numbers, to include ADDISON and CW-2.

42.   Between June 2015 and May 2018, ADDISON's AMITY AMEX Account had over 1500 transactions totaling approximately $609,900 worth of expenses charged by ADDISON.  Those expenses largely broke

down into the following categories: entertainment, food and beverage, travel, and retail.

43.   CW-2 stated that AMITY paid kickbacks in the form of goods and services, for example, elaborate lunches, happy hours, expensive dinners, Warriors tickets, as well as, high end goods in the form of purses purchased from, Gucci, Louis Vuitton, and Nordstrom.

44.   ADDISON's retail charges on her AMITY AMEX Account were approximately $106,000.  Between December 2015 and April 2018, a few of the major retail expenses included approximately $48,800 worth of charges from Chanel, approximately $6,700 from Neiman Marcus, approximately $6,000 from Yves Saint Laurent, and approximately $5,700 from Louis Vuitton.  This does not include all of ADDISON's retail expenses.

45.   ADDISON's entertainment charges on her AMITY AMEX Account were over $134,000.  Between December 2015 and April 2018, ADDISON purchased approximately $113,900 worth of charges from StubHub. StubHub is an online ticket marketplace where individuals can purchase or sell tickets for sports, music, and theatre events, including Golden State Warriors basketball tickets.

46.   On January 14, 2019, the Honorable United States Magistrate Judge Kandis A. Westmore approved an application by the FBI for a warrant to search Apple iPhone associated with cellular telephone number 510-585-5059 belonging to SINGH (the "SINGH Account").  I have reviewed the contents of the SINGH Account, which include, among other things, a list of SINGH's contacts, preserved Apple iMessage messages, text messages, and WhatsApp messages.  I believe the following iMessage, text, and WhatsApp conversations, among others,

contribute to a showing that probable cause exists to believe that ADDISON has violated the above mentioned statutes.

47. On or about December 8, 2018, ADDISON and SINGH were part of a WhatsApp text string from the SINGH Account. In the WhatsApp conversation, ADDISON and SINGH discussed purchasing Warriors tickets for an individual believed to be the Director of Nursing at a rehabilitation center located in Oakland, California. I believe the Warriors tickets are an incentive for the individual employed as the Director of Nursing to refer patients to AMITY. This text conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| ADDISON: | don wants to know if he can her tics for the warriors don of [Rehabilitation Center]? | "DON" is an acronym for Director of Nursing. I believe ADDISON is referring to purchasing Warriors tickets for the Director of Nursing at a rehabilitation center located in Oakland, California. |
| SINGH: | Are we giving Anything | I believe SINGH's statement, "are we giving anything" is SINGH asking ADDISON if the DON receives kickback payments from AMITY in another form. |
| ADDISON: | no | |
| SINGH: | Ok get it | |

48. On or about September 25, 2018, ADDISON and SINGH were part of a WhatsApp text string from the SINGH Account. In the WhatsApp conversation, ADDISON and SINGH discussed purchasing concert ticket in exchange for the referral of patients. SINGH approved the purchase; however, SINGH wanted reassurances that Individual 2, a

24

hospital case manager in Fremont, California, will refer all of her patients, to include hospice patients to AMITY and/or ADVENT. This text conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---------|----------------|------------------------|
| ADDISON: | gm boss [Individual 2] beyoncé tics<br>these are the ones she wants<br><br>[ADDISON sent SINGH a picture of the pricing for two tickets to the Beyonce & Jay-Z concert scheduled on September 29; two tickets were $926.25 each] | |
| SINGH: | Well we can but what will she do for us<br><br>I need full communication<br><br>Hospice all under us<br><br>Check all floors<br><br>And all under us | SINGH is willing to approve ADDISON's request to purchase concert tickets for Individual 2; however, SINGH wants "all under us" which refers to reassurances that Individual 2 will referral all of her patients, to include hospice, to SINGH's companies.<br><br>I believe this statement directly correlates the concert tickets as an incentive in exchange for patient referrals to AMITY or ADVENT.<br><br>I believe "check all floors" to mean that SINGH wants Individual 2 to be aware of all patients on every floor of the hospital and expects Individual 2 to make every effort to refer those patients to AMITY or ADVENT. |
| ADDISON: | i will tell her for sure | |

III. PROBABLE CAUSE FOR THE VIOLATION

49.  **Title 42 United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime to knowingly and willfully offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

50.  Medicare is a federally funded health insurance program that provides funds for health care services provided to individuals aged 65 or above, and to certain disabled persons.  The U.S. Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program, which is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

51.  Therefore, the referral of Medicare patients for home health services, which is subsequently billed to Medicare, constitute a referral for an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program; and an arrangement or ordering of a service for which payment may be made in whole or in part under a Federal health care program, as defined by 42 U.S.C § 1320a-7b(b)(1)(A) and (B).

52.  There is probable cause to believe that ADDISON has knowingly and willfully offered kickback payments to doctors, case managers, social workers, and other healthcare professionals in exchange for the referral of Medicare patients, in violation of Title

26

42 United States Code, Section 1320a-7b(b)(2)(A), the anti-kickback act.

53.  The above allegations are supported by witness statements, recorded statements, evidence obtained through the execution of a search warrants, and corroborating documentary evidence.

IV.  CONCLUSION

54.  Based on the evidence set forth herein, there is probable cause to believe ADDISON conspired to facilitate kickback payments in exchange for the referral of Medicare patients for home health services, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2)(A).

V.  REQUEST FOR SEALING

55.  Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation.  Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.  Accordingly, I respectfully request the Court issue an

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

order directing this Affidavit and any related documents be sealed
until the further order of this Court.

_____

Katelyn McKendrick, Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this 3rd day of September, 2019.

_____

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge